# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

PAUL M. McMANUS,                     )
                                                      )
      Petitioner,                        )
                                                      )
      v.                                 )     Case No. 1:07-cv-1483-TWP-MJD
                                                      )
BILL WILSON, Superintendent[1]       )
                                                      )
      Respondent.                        )

## ENTRY DISCUSSING PETITION FOR WRIT OF HABEAS CORPUS

## I. INTRODUCTION

This cause is before the court on the petition of Paul McManus ("McManus") for a Writ of Habeas Corpus (Dkt. 14), on the respondent's response to such petition, and on McManus' reply. The record has been appropriately expanded.

Whereupon the court, having read and considered such pleadings, and having also considered the expanded record, finds that McManus' petition for a writ of habeas corpus must be **denied**.

## II. BACKGROUND

McManus was convicted by a jury, of murdering his wife and two daughters. The jury recommended the death penalty and the trial court sentenced McManus to death on June 5, 2002. McManus' conviction and sentence were affirmed on direct appeal in *McManus v. State*, 814 N.E.2d 253 (Ind. 2004) (*McManus I*).

The facts and circumstances surrounding McManus' offenses were described as follows:

On February 26, 2001, Paul McManus murdered his estranged wife and two children. Prior to the murders, McManus separated from his wife and was arrested for domestic battery. In the course of the domestic battery, he threatened to kill

---

[1] Petitioner's custodian, named in his official capacity only, is **substituted** as the sole and proper respondent.

"everyone." During the weeks immediately preceding the murders, McManus spoke of suicide and killing his family.

On the morning of February 26, 2001, McManus' wife served him with divorce papers. That same day, McManus took a taxi to a gun store, purchased ammunition, and retrieved a handgun from his brother's house. At about 7:45 p.m., McManus entered his wife's house and shot her once in the leg and three times in the head. He then shot his eight-year-old daughter three times in the head and his two-year-old daughter once in the head.

Police investigators later retrieved a cassette tape recorded by McManus. The transcript of the cassette reads in part:

> Well, if you're listening to this tape, I guess I've done what I had to do. I don't expect you guys to understand, but I had to do it….I want you to make sure that I am buried with my kids and my wife. No matter what, I want you to make sure that happens.

Tr. at 701.

The shootings were uncontested at trial. McManus relied upon an insanity defense.

*McManus I,* 814 N.E.2d at 254-55.

Following an evidentiary hearing based on McManus' petition for post-conviction relief, the trial court vacated his death sentence after finding that McManus satisfied Indiana's mental retardation standard and that he was entitled to relief under *Atkins v. Virginia*, 536 U.S. 304 (2002). The Indiana Supreme Court reversed the vacation of McManus' death sentence, reinstated the death sentence and otherwise affirmed the judgment denying relief. *McManus v. State,* 868 N.E.2d 778 (Ind. 2007) (*McManus II)*. McManus' petition for rehearing was denied on September 28, 2007. His petition for writ of certiorari was denied on March 31, 2008. *McManus v. Indiana*, 552 U.S. 1298. The filing of the present action seeking a writ of habeas corpus followed on February 18, 2008.

McManus claimed in his direct appeal that: 1) Indiana's death penalty statute violated McManus' rights under the Sixth and Eighth Amendments; 2) the trial court erred in allowing

experts to testify that McManus' mental illness was not mitigating; 3) the trial court erred in denying McManus' motions for mistrial because McManus was incompetent to stand trial as a result of ingesting medication; 4) the trial court erred in refusing to admit at McManus' sentencing hearing a newspaper article interview of jurors; and 5) the State's failure to disclose exculpatory information of the medications that were being administered to McManus denied him a fair trial.

On appeal from post-conviction, McManus claimed that: 1) the post-conviction court correctly ruled that McManus met Indiana's definition of mental retardation and is ineligible for the death penalty; 2) the post-conviction court properly ruled that the evidence in question should be admitted and the State waived the issue for review by not objecting at the hearing and declining the post-conviction court's offer of additional time to meet the evidence; 3) the medications given to McManus at trial rendered him incompetent to be tried; 4) trial counsel rendered ineffective assistance through minimal mitigation investigation; and 5) trial counsel had a conflict of interest.

McManus' claims in his petition for a writ of habeas corpus are that: 1) he was incompetent at trial due to ingesting medication; 2) he was forced to appear before the jury in a "drug-induced stupor that dramatically and artificially altered his demeanor"; 3) the State failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); 4) his execution is barred by the Eighth Amendment because he is mentally retarded; 5) trial counsel was ineffective in investigating and presenting mitigating evidence; and 6) he was sentenced to death based upon findings made by a judge, not a jury.

# III. __STANDARD OF REVIEW__

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a) (1996). *See Conner v. McBride,* 375 F.3d 643, 649 (7th Cir. 2004).

Review of McManus' habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lambert v. McBride,* 365 F.3d 557, 561 (7th Cir. 2004). The AEDPA "place[s] a new constraint" on the ability of a federal court to grant habeas corpus relief to a state prisoner "with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 412 (2000). Under the AEDPA, if a state court adjudicated a constitutional claim on the merits, a federal court may grant habeas relief only if the state court decision was contrary to, or involved an unreasonable application of, Supreme Court precedent, or if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding. 28 U.S.C. § 2254(d)(1), (2); *Early v. Packer,* 537 U.S. 3, 7-8 (2003); *Lambert,* 365 F.3d at 561.

The following principles provide guidelines for an AEDPA analysis.

- A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 404-08 (2000).

- A state court decision is contrary to clearly established law if it applies a legal standard inconsistent with governing Supreme Court precedent or contradicts the Supreme Court's treatment of a materially identical set of facts. A state court unreasonably applies Supreme Court precedent if the state court identifies the correct legal rule but applies it in a way that is objectively unreasonable. *Bynum v. Lemmon,* 560 F.3d 678, 683 (7th Cir. 2009)(internal citations omitted).

- "Clearly established federal law" means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003).

- Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *Williams,* 529 U.S. at 407; *see also Badelle v. Correll,* 452 F.3d 648, 653 (7th Cir. 2006). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen,* 130 S. Ct. 841, 845 (2010). The Seventh Circuit "has defined 'objectively unreasonable' as lying well outside the boundaries of permissible differences of opinion and will allow the state court's decision to stand if it is one of several equally plausible outcomes." *Burgess v. Watters,* 467 F.3d 676, 681 (7th Cir. 2006)(international citations and quotations omitted).

- "Under AEDPA, federal courts do not independently analyze the petitioner's claims; federal courts are limited to reviewing the relevant state court ruling on the claims." *Rever v. Acevedo,* 590 F.3d 533, 536 (7th Cir. 2010).

- "The habeas applicant has the burden of proof to show that the application of federal law was unreasonable." *Harding v. Sternes,* 380 F.3d 1034, 1043 (7th Cir. 2004)(citing *Woodford v. Visciotti,* 537 U.S. 19, 25 (2002)).

- With respect to § 2254(d)(2), state-court determinations of factual issues are "presumed correct" unless the petitioner can rebut the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Sprosty v. Buchler,* 79 F.3d 635, 643 (7th Cir. 1996). To overcome the presumption, a habeas petitioner must proffer clear and convincing evidence to show that a factual determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Williams v. Beard,* 2011 802047, *6 (3rd Cir. 2011)(footnote omitted) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

In addition to the foregoing substantive standards, "[a] state prisoner . . . may obtain federal habeas review of his claim only if he has exhausted his state remedies and avoided procedurally defaulting his claim." *Thomas v. McCaughtry,* 201 F.3d 995, 999 (7th Cir. 2000). "It is the rule in this country that assertions of error in criminal proceedings must first be raised in state court in order to form the basis for relief in habeas. Claims not so raised are considered defaulted." *Breard v. Greene,* 523 U.S. 371, 375 (1998) (citing *Wainwright v. Sykes,* 433 U.S. 72 (1977)). Procedural default "occurs when a claim could have been but was not presented to the state court and cannot, at the time that the federal court reviews the habeas petition, be presented to the state court." *Resnover v. Pearson,* 965 F.2d 1453, 1458 (7th Cir. 1992), *cert. denied,* 508

U.S. 962 (1993). When procedural default has occurred, it can be overcome if a habeas petitioner "can demonstrate either (a) cause for the default and prejudice (*i.e.,* the errors worked to the petitioner's '*actual* and substantial disadvantage,'); or (b) that failure to consider his claim would result in a fundamental miscarriage of justice (*i.e.*, a claim of actual innocence)." *Conner v. McBride,* 375 F.3d 643, 648 (7th Cir. 2004) (internal citations omitted); *see also Dellinger v. Bowen,* 301 F.3d 758, 764 (7th Cir. 2002), *cert. denied,* 537 U.S. 1214 (2003).

## IV. <u>DISCUSSION</u>

### A. Incompetency at Trial Due to Medication

The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants. *Pate v. Robinson,* 383 U.S. 375, 384-86 (1966). Our Constitution forbids the trial of a defendant who is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses. *Eddmonds v. Peters,* 93 F.3d 1307, 1314 (7th Cir. 1996), *cert. denied* 520 U.S. 1172 (1997).

The constitutional standard is established in *Dusky v. United States,* 362 U.S. 402 (1960): The question of whether a defendant is competent focuses on "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." The Seventh Circuit recently explained, that in assessing a petitioner's competency,

> [t]he inquiry is highly individualized. "There are . . . no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope v. Missouri,* 420 U.S. 162, 180, 95 S. Ct. 896, 43 L.Ed.2d 103 (1975). Relevant factors include any evidence of irrational behavior, the defendant's demeanor in court, and any medical opinions on the defendant's competency to stand trial. *Id.*

*Sturgeon v. Chandler*, 552 F. 3d 604, 612 (7th Cir. 2009).

6

"Not every manifestation of mental illness demonstrates incompetence to stand trial; rather the evidence must indicate a present inability to assist counsel or understand the charges." *United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1012 (7th Cir. 1984), *cert. denied,* 469 U.S. 1193 (1985); *Galowski v. Berge,* 78 F.3d 1176, 1182 (7th Cir. 1996). As the Seventh Circuit opined in *Eddmonds:*

> There is no question that [the defendant] is a disturbed man, and has been so for some time. . . . But that doesn't necessarily mean he was unfit for trial. If it did then no one guilty of heinous crimes could be tried. Fitness for trial is a much narrower concept than moral or social wellness.

93 F.3d at 1314; see also *Medina v. Singletary,* 59 F.3d 1095, 1107 (11th Cir. 1995) (stating "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial").

McManus claims that he was incompetent to proceed at trial due to ingestion of medication. He made multiple requests for continuances and mistrials. McManus requested two continuances for treatment and examination. These were granted without objection. However, on April 30, 2002, following a hearing in which McManus' emergency room physician testified as to McManus' treatment and condition, a third request for a continuance or a mistrial on the grounds that McManus was not competent was denied. McManus renewed his request on May 1, 2002, and that request was also denied. That same day, McManus complained of symptoms related to ingesting medication and requested a continuance. He agreed to a one-week continuance in lieu of a mistrial. On May 6, 2002, McManus filed another motion for mistrial and a hearing was held the following day. At that hearing, Dr. Whitehead testified about his examinations of McManus on May 2, 2002, and on May 7, 2002. The trial court denied McManus' motion, finding him competent. The guilt and penalty phases were thereafter held and completed.

On direct appeal, the Indiana Supreme Court specifically addressed McManus' claim that he was incompetent at trial:

> It is apparent that the trial court based its decision on continual reports from medical professionals who maintained contact with McManus throughout the trial. While the testimony was often equivocal, the consensus of the witnesses was that the medications assisted McManus in participating in his trial. Without the medications, McManus proved to be unable to cope with the stress of the proceeding. McManus' situation is markedly different from the defendant who requires medication to attain competence so that the trial can begin. Before trial, McManus was competent and participated in preparing his case. The administration of medication appeared to manage a sudden onset of stress, rather than to medicate a diagnosed psychosis. Reliance on psychotropic drugs during trial is obviously to be approached with great care, and competency hearings to evaluate the effects on a defendant's ability to appropriately participate in his or her defense are very important. In the case at bar, we cannot say that the trial court's competency determination was clearly erroneous . . . .

*McManus I*, 814 N.E.2d at 264. Thus, the trial court found, and the Indiana Supreme Court recognized and agreed, that McManus was competent to stand trial. That determination is to be treated as a finding of fact for federal habeas purposes. This was the conclusion reached in *Maggio v. Fulford,* 462 U.S. 111, 117 (1983) (per curiam)), as cited in *Thompson v. Keohane,* 516 U.S. 99, 111 (1995), and *Wallace v. Ward,* 191 F.3d 1235, 1243-44 (10th Cir. 1999), and similar circumstances were discussed by Judge McKinney in *Woods v. Anderson,* 302 F.Supp.2d 915, 927 (S.D.Ind. 2004).

McManus has not rebutted the State Courts' findings by clear and convincing evidence. McManus has not shown error in the trial court's determination of his competence to stand trial with respect to the process used, with respect to the facts found (which would require the showing of "clear and convincing evidence" as prescribed by § 2254(e)(1)), with respect to the standard applied, or with respect to the result reached. McManus is thus not entitled to relief on this ground.

## B. Appearance Before the Jury

McManus claims that he was forced to appear before the jury in a "drug-induced stupor that dramatically and artificially altered his demeanor," in violation of his right to a fair trial and a reliable sentencing determination under *Riggins v. Nevada*, 504 U.S. 127 (1992). Respondent challenges this claim in part because McManus did not present this argument on direct appeal as a federal claim.[2]

The Seventh Circuit looks to four factors to determine whether a claim has been fairly presented to state courts in federal constitutional terms. The factors are:

> (1) whether the petitioner relied on federal cases that engage in constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation

*Sweeney v. Carter,* 361 F.3d 327, 332 (7th Cir. 2004). The "bottom line," however, is "whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *Ellsworth v. Levenhagen,* 248 F.3d 634, 639 (7th Cir. 2001) (omitting internal quotations and citations); *see also Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001) (to satisfy the fair presentment requirement, the petitioner must present both the operative facts and the legal principles that control each claim to the state judiciary; otherwise, he has forfeited federal review of his claim).

Here, McManus did not fairly present a federal constitutional claim on direct appeal and these circumstances prevent McManus from proceeding with this claim because under Indiana procedural rules, all grounds for post-conviction relief which were available at the time of trial,

---

[2] McManus concedes in his reply brief that he did not present a *Riggins* or forced medication claim in his direct appeal. Reply at pp. 26-27.

direct appeal, or prior petition but were not raised in those proceedings are deemed waived. *See Lane v. Richards,* 957 F.2d 363, 366 (7th Cir.) (issues were not presented on direct appeal and relief would be barred by procedural default), *cert. denied,* 113 S. Ct. 127 (1992).

Respondent also claims that when McManus raised this claim at post-conviction, it was disposed of on an adequate and independent state law ground. Specifically, the Indiana Supreme Court held:

> McManus argues that he was not competent to stand trial and that his incompetence prejudiced him before the jury. The post-conviction court held these claims barred by *res judicata* because of our treatment of them in McManus' direct appeal. See *McManus*, 814 N.E.2d at 260-64. Still, McManus asserts that we did not address competency despite our conclusion that 'we cannot say that the trial court's competency determination was clearly erroneous' *Id.* at 264. The post-conviction court was correct that McManus' competency claims are *res judicata*.

*McManus II*, 868 N.E.2d at 790. A federal court will not review a question of federal law decided by a state court if the state court's ruling rests on state law grounds independent of the federal question and adequate to support the judgment. *Coleman v. Thompson,* 501 U.S. 722, 729 (1991). Assuming that McManus properly raised this claim in state court, the independent and adequate state ground doctrine "applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id.* at 729-30. *Res judicata* is such an adequate and independent state ground. *Franklin v. Gilmore,* 188 F.3d 877, 883 (7th Cir. 1999), *cert. denied,* 120 S. Ct. 1535 (2000). In order to avoid this bar, the habeas petitioner must demonstrate cause for the default and actual prejudice resulting from the alleged violation of federal law, or else demonstrate that failure to consider his claims would result in a fundamental miscarriage of justice. See *Coleman,* 501 U. S. at 750. McManus has not done so here. McManus' claims that he was forced to appear before the

jury in a drug-induced stupor in violation of *Riggins* does not support the award of federal habeas relief.

## C.  Brady v. Maryland

McManus claims that the State failed to disclose exculpatory evidence regarding the nature and effect of the medication administered to McManus during his trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, McManus claims that the State failed to disclose the mind-altering effects of the medication administered by the State to both defense counsel and the jury; and assert that this nondisclosure affected the jury's resolution of the issue of McManus' sanity and the jury's sentencing recommendation.

Pursuant to *Brady*, the prosecution has an affirmative duty to disclose evidence that is both favorable to the defense and material to either guilt or punishment. To establish "a 'true *Brady* violation' consists of (1) evidence favorable to the defendant (2) that is suppressed by the prosecution, (3) resulting in material prejudice to the defendant." *Newell v. Hanks,* 335 F.3d 629, 632 (7th Cir. 2004) (citations omitted). In concluding that there was no *Brady* violation, the Indiana Supreme Court stated:

> The transcript and record are replete, however, with references to every drug administered to McManus. Indeed, McManus moved the trial court for continuances and mistrial arguing incompetence due to improper administration of medication and proffered extensive evidence relating to McManus' medications. At moments when it mattered, evidence about McManus' medication was laid out for all to see.

*McManus I*, 814 N.E.2d at 264. Because there was full disclosure, discussion and examination of this issue in the trial court, and because there was no material prejudice to McManus, there was no *Brady* violation. The Indiana Supreme Court correctly recognized *Brady* as the controlling decision of the United States Supreme Court. Its conclusion was not contrary to federal law as determined by the Supreme and was "'at least minimally consistent with the facts and

circumstances of the case.'" *Schultz v. Page,* 313 F.3d 1010, 1015 (7th Cir. 2002) (quoting *Schaff v. Snyder,* 190 F.3d 513, 522 (7th Cir. 1999)). The deferential standard of § 2254(d) insulates McManus from entitlement to relief based on this claim.

## D. Mental Retardation

The Supreme Court has ruled out the death penalty for the mentally retarded. *Atkins v. Virginia,* 536 U.S. 304 (2002). *Atkins* leaves it to each state to define mental retardation.

McManus claims that his execution is barred because he is mentally retarded. He argues that the Indiana Supreme Court's determination otherwise is based on an unreasonable determination of the facts presented and/ or an unreasonable application of *Atkins*.

In Indiana, a mentally retarded individual is someone who, "before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior . . . ." IND. CODE § 35-36-9-2.

The post-conviction court conducted an evidentiary hearing and found by a preponderance of the evidence that McManus was mentally retarded as defined under Indiana law. However, in reviewing the post-conviction court's findings, the Indiana Supreme Court determined that McManus did not satisfy the appropriate standard for mental retardation under Indiana law. Specifically, the Indiana Supreme Court looked at the intellectual functioning and adaptive behavior prongs of Indiana's mental retardation statute and concluded that McManus did not satisfy either prong.

"On habeas review, we presume that the factual findings of the state appellate court are correct in the absence of clear and convincing evidence to the contrary." *Baddelle v. Correll,* 452 F.3d 648, 659 (7th Cir. 2006) (citing 28 U.S.C. § 2254(e)(1) and *Ruvalcaba v. Chandler,* 416 F.3d 555, 559 (7th Cir. 2005)). In a setting such as this, McManus "has the burden of rebutting

the presumption by 'clear and convincing evidence.'" *Lamon v. Boatwright,* 467 F.3d 1097, 1102 (7th Cir. 2006) (quoting § 2254(e)(1) and citing *Rice v. Collins,* 126 S. Ct. 969, 974 (2006)). This is a "rigorous burden of proof." *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999).

 *Significantly subaverage intellectual functioning.* In reviewing the "significantly subaverage intellectual functioning" prong of Indiana's mental retardation statute, the Indiana Supreme Court explained that, "[o]f these five [IQ] tests [given to McManus at ages 7,11,14, 30 and 34], McManus scored *above* the 70-75 cutoff on three. On the two remaining tests, McManus scored 70 and 72, but the record demonstrates these scores were suppressed because McManus was either not working to his full potential or suffering from severe depression and anxiety." *McManus II,* 868 N.E.2d at 786. Furthermore, the Supreme Court noted that experts testified both at trial and during McManus' post-conviction hearing that he was not below Indiana's threshold for the intellectual functioning prong of the mental retardation statute. Specifically:

> Dr. David Hilton, a court-appointed psychiatrist, testified that his 'abbreviated assessment of cognitive functioning would suggest probably low average intelligence," and he noted that McManus' "general presentation, communication skills, and use of vocabulary . . . would *not* suggest mental retardation, nor would his history of being able to maintain employment in a number of different jobs with varied skill requirements.' (State's Trial Ex. 63 at 12 (emphasis added).)

> John Ireland, Ph.D., a clinical psychologist who testified at trial for the defense, concluded McManus' actual IQ was likely in the "80-type range," well above the 70-75 cutoff. (Trial Tr. at 1692.) Dr. Ireland gave less weight to McManus' age fourteen IQ score of 72, because the evaluator noted McManus "was active, fidgety, immature, impulsive, easily frustrated, wanted to terminate testing activities, [and] responded with I don't know." (*Id.* at 1689.) Dr. Ireland questioned whether this score indicated borderline intellectual functioning or was the simple result of McManus not trying. (*Id.*) In addition, since these are typical behaviors for students with ADHD, Dr. Ireland questioned whether McManus' ADHD or other learning disabilities influenced the score. (*Id.* at 1691-92.)

Michael Gelbort, Ph.D., a clinical psychologist who testified at trial for the defense, conducted McManus' IQ test at age 30, which resulted in a score of 70. (*Id.* at 1417-18.) Even though this is McManus' lowest score, this score still falls right on the cutoff, and Dr. Gelbort conceded that this score was likely suppressed since McManus was on trial for murder and obviously experiencing anxiety and depression. (*Id.* at 1421.)

Edmund Haskins, Ph.D., a clinical neuropsychologist who testified for the defense at the post-conviction hearing, concluded McManus' IQ was likely "in the high 70s, maybe even low 80s," again above the 70-75 cutoff. (PC Hr'g Tr. at 429.) Dr. Haskins himself conducted McManus' IQ test at age thirty-four, which resulted in a score of 78. (*Id.* at 403.) After reviewing McManus' history and other scores, Dr. Haskins speculated that McManus' learning disability and ADHD likely contributed to executive functioning problems and McManus' two suppressed scores. (*Id.* at 403-04, 413-16.)

Dennis Olvera, Ph.D., a psychologist who testified for McManus at the post-conviction hearing, concluded that McManus was *not* currently mentally retarded. (*Id.* at 383.) Dr. Olvera testified, "I can't [say McManus is currently mentally retarded] because of the IQ testing that Dr. Haskins completed and the elevation of the scores." (*Id.*)

Finally, Martin Groff, Ph.D., a psychologist who testified at the post-conviction hearing for the State, reviewed all of McManus' IQ tests and concluded McManus is *not* below the level of intellectual functioning that defines mental retardation. (*Id.* at 602.) Dr. Groff testified that only two scores raised the potential issue whether McManus might satisfy the intellectual functioning prong, and both scores were still within the 70-75 cutoff (one score of 70 and the other 72). (*Id.* at 595-98, 600-01.) More importantly, Dr. Groff discounted the score of 72 because "it was the examiner's judgment that Mr. McManus wasn't giving adequate effort," and as a result, "the scores likely underestimated his potential intellectual ability." (*Id.* at 597.) He also discounted the score of 70 because the examiner noted that McManus was "anxious and depressed" at the time of testing which would suppress his score. (*Id.* at 598.)

*McManus II*, 868 N.E.2d at pp. 786-787. In its footnote 6, omitted from the above quotation discussing the testimony of Dr. Groff, the Supreme Court added that the examiner who gave the score of 72 also "noted that Mr. McManus tried to terminate the testing and would respond that he didn't know answers to questions, but with prompting [he] was sometimes able to produce those answers." *Id.,* at 787 n.6 (citing to PC Hr'g Tr. at 597).

14

The Indiana Supreme Court then explained that although McManus' testing history shows that he did not manifest significantly subaverage intellectual functioning, his "school history, work history and life functioning only strengthen this conclusion." The Indiana Supreme Court noted that despite battling ADHD and learning disabilities, McManus' still graduated from high school, he worked three jobs in an effort to support his family including managing bar backs and occasionally working security at a local restaurant, where his supervisor described him as an "excellent employee." At his RuVan Plastics job, he worked in several departments including cut-up, mixing and trash, he drove a fork-lift and he was required to pass a test for that position. He was described by a supervisor as a "very good worker" who was reliable and between his other jobs, he cleaned the office at another company. *Id.* at 787 (citations to trial transcript and post-conviction hearing transcript omitted). Finally, the Indiana Supreme Court noted that McManus was "known by all as an excellent father" to his daughters, and that McManus "comfortably cared for Shelby and was able to feed her through a tube in her stomach, work with her therapists, bathe her, play with her and make her laugh." *Id.* (citations to trial transcript omitted). The Indiana Supreme Court determined that the post-conviction court's finding that McManus manifested significantly subaverage intellectual functioning was "clearly erroneous." *Id*. at 785.

McManus challenges the Indiana Supreme Court's conclusions regarding the significantly subaverage intellectual functioning prong as unsupported by the evidence and as rebutted by expert testimony and the clinical authorities of the American Association of the Mentally Retarded (now the American Association of Intellectual and Developmental Disabilities) and the American Psychiatric Association. Specifically, McManus claims that the

Indiana Supreme Court wrongly considered the 81 and 78 IQ scores from 1982 and 2006 as stronger scores than the 72 and 70 scores from 1986 and 2002 because the evidence does not support that the lower scores were inaccurate as to McManus' intellectual functioning. Furthermore, McManus claims that the Indiana Supreme Court's assertion that McManus cannot be mentally retarded because he graduated from high school, held three jobs and was an "excellent father" is a "vague, unsupported standard."

The evidence considered by the Indiana Supreme Court included IQ tests that were outside the range for significantly subaverage intellectual functioning and expert testimony that McManus did not manifest significantly subaverage intellectual functioning, including testimony that McManus' IQ may be near 80. The Indiana Supreme Court discussed why some of the IQ scores were weighted more than others, including an explanation as to why McManus' 70 and 72 scores may have been suppressed based on observations noted at the time of test administration. The Indiana Supreme Court also explained that other indicators did not suggest mental retardation. While the Indiana Supreme Court mentioned the fact that McManus graduated from high school, held three jobs and exhibited good parenting skills, even completely disregarding these factors, the IQ tests and other evidence supported the Indiana Supreme Court's finding that McManus did not manifest significantly subaverage intellectual functioning. Consequently, it is not an unreasonable determination of the facts to conclude that McManus did not manifest significantly subaverage intellectual functioning. McManus has not shown by clear and convincing evidence that the Indiana Supreme Court made an unreasonable determination of the facts in reaching its conclusion. Additionally, the determination that McManus did not manifest

significantly subaverage intellectual functioning and consequently, was not mentally retarded, was not an unreasonable application of *Atkins*.

   *Substantial Impairment of Adaptive Behavior*. McManus also claims that he manifested substantial impairment of adaptive behavior based on testimony of McManus' family members, employers, teachers and expert Dr. Dennis Olvera. McManus challenges the rebuttal testimony of Dr. Groff, the state's psychologist at the post conviction hearing, because he only "sees such individuals 'occasionally' in his practice" and "[h]e did not personally administer any tests or interview anybody, but relied upon the reports and records of others."

   The post-conviction court's adaptive behavior assessment discussed the use of the Vineland-II Adaptive Behavior Scales ("VABS II) and the Adaptive Behavior Assessment System II ("ABAS II"). After reviewing the post-conviction court's adaptive behavior assessment, the Indiana Supreme Court determined that of the VABS II and the ABAS II scores, the ABAS II scores were the most reliable because they most closely resembled the AAMR's definition. The Indiana Supreme Court determined that Indiana's definition tracks the AAMR's definition and that as to the VABS II which included interviews with McManus' sister and sister-in-law, "the weight of the results is open to doubt, for as Dr. Olvera conceded, McManus' family members 'might be inclined to portray Mr. McManus as less competent than he might actually be, in an effort to help him evade the death penalty.'" Further, "[i]t seems apparent that these [VABS II communication] scores, inconsistent with the rest of the record, were suppressed by the affection of the relatives who supplied the input." *McManus II*, 868 N.E.2d at 788-89 (internal citations omitted).

In support of its finding that McManus did not manifest substantial impairment of adaptive behavior, the Indiana Supreme Court explained Dr. Olvera's calculation of the conceptual, social and practical domains as well as the General Adaptive Composite score ("GAC"), noting that each score has a mean of 100 with a standard deviation of 15. McManus' conceptual, social and practical domain scores were 82, 90 and 93, respectively, with a GAC score of 88. *McManus II*, 868 N.E.2d at 788 (internal citations omitted). The Indiana Supreme Court explained that although (1) Dr. Olvera tried to argue that McManus still demonstrated significant impairment of adaptive functioning on two of the ten individual ABAS scores because McManus scored a 5 on community use and a 2 on functional academics, (2) she admitted that "[n]one of the scaled scores for the [three] ABAS II adaptive domains or the GAC was consistent with what would be expected among individuals who have mental retardation." And (3) McManus had to show substantial impairment in at least one of the three conceptual, social or practical domains. Furthermore, only the functional academics score of 2 was two standard deviations below the mean, with the low score attributed to McManus' learning disabilities and ADHD. As explained by the Indiana Supreme Court:

> An adequate adaptive behavior assessment necessarily considers McManus' work history and day-to-day life, both of which illustrate his abilities-not deficits. As we already said, McManus successfully held down three jobs. Each of his employers testified that he was a good, reliable worker. Three employers contributed to his ABAS II scores, and each employer testified that he was not impaired. As a result, the ABAS II scores did *not* reflect significant impairment in any of the three domains. Finally, McManus had no difficulty feeding Shelby through her feeding tubes or caring for her on a daily basis. We conclude that McManus does not have significant adaptive behavior impairments.

*Id.* at 789. Consequently McManus did not demonstrate substantial impairment of adaptive behavior. *Id.* McManus has not shown by clear and convincing evidence, as required by 28

U.S.C. § 2254(e)(1), that this factual finding is based on an unreasonable determination of facts. Furthermore, the conclusion that McManus did not suffer from substantial impairment of adaptive behavior, and therefore was not mentally retarded, was not an unreasonable application of *Atkins*.

### E. Ineffective Assistance of Trial Counsel

A defendant has a right under the Sixth Amendment to effective assistance of counsel at trial. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). To establish ineffective assistance of counsel under *Strickland,* the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Id.* For a petitioner to establish that "counsel's assistance was so defective as to require reversal" of a conviction or a sentence, he must make two showings: (1) deficient performance that (2) prejudiced his defense. *Id.,* at 687.

With respect to the first prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith,* 539 U.S. 510, 521 (2003) (quoting *Strickland,* 466 U.S. at 688). With respect to the prejudice requirement, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694; *see also Bell v. Cone,* 535 U.S. 685, 697-98 (2002). It is not enough for a petitioner to show that "the errors had some conceivable effect on the outcome of the proceeding." *Strickland,* 466 U.S. at 693. A petitioner must specifically explain how the outcome at trial would have been different absent counsel's ineffective assistance. *Berkey v. United States,* 318 F.3d 768, 773 (7th Cir. 2003).

"In a capital case, the two-prong *Strickland* analysis is applied at both the guilt and penalty phase." *Fugate v. Dep't of Corrs.,* 261 F.3d 1206, 1216 (11th Cir. 2002) (citing *Mincey v. Head,* 206 F.3d 1106, 1142 (11th Cir. 2000)). "Capital jurisprudence has long recognized that counsel's ability to advocate effectively during the sentencing phase is derived from adequate preparation directed specifically to the penalty phase." *Marshall v. Hendricks,* 307 F.3d 36, 99 (3d Cir. 2002). In the context of a capital sentencing proceeding, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentence…would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695.

When the AEDPA standard is applied to a *Strickland* claim the following calculus emerges:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable--a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance,* 129 S. Ct. 1411, 1420 (2009) (internal citations and quotations omitted).

McManus presents four specifications of ineffective assistance of counsel. These specifications relate to his counsels' failure to properly investigate and present mitigating evidence. Specifically, McManus claims that trial counsel failed to: (1) properly investigate records and witnesses regarding his education; (2) identify and interview specific friends and family as mitigation witnesses; (3) investigate whether McManus was mentally retarded; and (4) secure the appropriate experts to make an assessment of McManus.

The Indiana Supreme Court reviewed McManus' claim that trial counsel was deficient and concluded that:

> McManus' trial counsel presented the bulk of their mitigating evidence during the guilt phase of trial. The evidence included favorable testimony from three mental health professionals, a childhood friend, a co-worker, and McManus' mother and sister, all during the two days leading up to the start of the penalty phase. The testimony covered McManus' educational history, childhood, personal relationships, and evidence of mental impairments.
>
> Counsel reasonably concluded that in the penalty phase the jury would be able to remember mitigating evidence presented over the previous two days. And we recall that "[w]hen mitigating evidence has already been presented at the guilty phase of trial, counsel's failure to duplicate this evidence during the penalty phase of trial does not constitute deficient performance." *Wrinkles v. State*, 749 N.E.2d 1179, 1199 (Ind. 2001) (citing *Wisehart v. State*, 693 N.E.2d 23, 48 (Ind. 1998)).
>
> Nonetheless, McManus argues that trial counsel should have investigated further and presented even more mitigating evidence. But McManus points only to evidence cumulative of that presented at trial. For example McManus asserts that trial counsel did not investigate his complete educational history. He argues that two of his former teachers should have testified at trial about his low intellect, enrollment in special education classes, social problems, difficulty reading, attention problems, and problems in his personal life. The record shows, however, that this evidence was admitted at trial (diagnosed with ADHD as a child), (parents divorced at age two or three), (after divorce, McManus rarely saw father, who later went to prison when McManus was seven; McManus had dyslexia, making reading difficult, and enrolled in special education classes), (parents remarried, but within two years father left for another woman, after which McManus attempted suicide), (other children made fun of McManus' speech problems and he "really never had friends" in school), (intellectual functioning test at age seven indicates McManus is "at the lower limits of the low average range").
>
> The investigation and presentation of mitigating evidence by trial counsel was substantial and the fact that post-conviction lawyers have managed to find some that may be non-cumulative does not lead to a conclusion different from that of the post-conviction court that McManus' trial counsel performed better that the Sixth Amendment requires.

*McManus II*, 868 N.E.2d at 791-92 (citations to record omitted).

There was no portion of the decisions of the Indiana Supreme Court in McManus' case which "appl[ied] a rule that contradicts the governing law . . . [or made] a decision that involve[d] a set of facts materially indistinguishable from a Supreme Court case that arrives at a different result." *Williams,* 529 U.S. at 405-06. The pertinent question thus becomes whether McManus has demonstrated that the Indiana Supreme Court, although identifying the correct legal rule, unreasonably applied the controlling law to the facts of the case. In *Wiggins v. Smith*, 539 U.S. 510, 523 (2003), the Court stressed that its endeavor was to "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' *Strickland,* 466 U.S. at 688, which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.' *id.,* at 689" (omitting parallel citations). That is precisely the consideration given to the issues and to the evidence by the Indiana Supreme Court in McManus' case.

Accordingly, this Court finds that (1) the AEDPA does apply to each of the specifications of deficient performance by McManus' counsel challenged in this case, (2) the "contrary to" prong of § 2254(d)(1) is not implicated by the circumstances of this case, and (3) the Indiana Supreme Court's decision on this point was not an "unreasonable application of" clearly established federal law. Similarly, McManus has not shown by clear and convincing evidence that the various recitations of evidence or factual findings by the Indiana state courts are not correct.

It has been noted that "only a clear error in applying *Strickland's* standard would support a writ of habeas corpus," *Holman v. Gilmore,* 126 F.3d 876, 8882 (7th Cir. 1997). While such errors do occur, *e,g., Brown v. Sternes,* 304 F.3d 677 (7th Cir. 2002); *Roche v. Davis*, 291 F.3d

22

473 (7th Cir. 2002), no such error occurred in the representation McManus received in the trial court. Accordingly, he is not entitled to relief as to this claim.

This Court has also concluded, independent of the deference commanded by the AEDPA to the Indiana Supreme Court's finding of no inadequate performance, that McManus was not prejudiced by the representation he received. See *Bieghler v. McBride,* 389 F.3d 701, 708 (7th Cir. 2004) (noting that capital habeas petitioner's failure to "demonstrate that additional mitigating evidence would have made any difference, let alone that counsels' investigation into these matters fell below objective standards of professional conduct" did not support claim of ineffective assistance of counsel)(citing *Conner v. McBride,* 375 F.3d 643, 662-63 (7th Cir.2004)). Therefore, McManus claim to the contrary fails.

## F.  Sentencing Error

McManus claims that he was sentenced to death based on findings made by the trial court judge rather than the jury in violation of the rule in *Ring v. Arizona*, 536 U.S. 584 (2002), that a jury, not the judge, must make the findings required to qualify a person to be sentenced to death. He adds the argument that the jury was instructed that their recommendation was not binding on the judge, thereby diminishing the jury's sense of responsibility in violation of the rule in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). McManus claims that the first of these violations was not cured just because the jury was required to make factual findings before it could recommend to the trial court judge that McManus be sentenced to death because the jury was instructed that the jury's recommendation was not binding on the judge.

"In *Ring,* the Supreme Court held that the Sixth Amendment jury trial guarantee extends to the determination of any fact, other than a prior conviction, that increases the maximum

punishment for first degree murder from life imprisonment to death. Essentially, this is an application, perhaps more accurately an extension, of the rule announced earlier in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000)." *Lambert v. McBride,* 365 F.3d 557, 562 (7th Cir. 2004).

The respondent argues that the Sixth Amendment constitutional requirements set forth in *Apprendi* and *Ring* were met because the aggravating circumstances were either admitted by McManus or substantiated by the jury's verdict. Specifically, the respondent notes that the charging information for the death penalty set forth that the following aggravators existed: (1) for each of the three murders, there was the aggravating circumstance that McManus had committed another murder, *see* IND. CODE § 35-50-2-9(b)(8); and (2) for the murders of both children, there was an aggravating circumstance that the victim was under twelve years old. *See* IND. CODE § 35-50-2-9(b)(12).

The Indiana Supreme Court reviewed this issue in McManus' direct appeal, specifically looking at the Sixth Amendment requirements as set forth in *Apprendi* and *Ring*. In reviewing such claim, the Indiana Supreme Court determined that:

> Under Indiana's statute as it read at the time of McManus's trial, a jury could recommend death only if it found the existence of at least one statutory aggravator beyond a reasonable doubt. All of our post-*Ring* case law concludes that a defendant whose jury has made such a finding has received what *Ring* and *Apprendi* require. Our re-examination of *Apprendi* and *Ring* provide us with no reason to change that interpretation.

*McManus I*, 814 N.E.2d at 256 (footnote omitted). The "post-*Ring*" consisted principally of the decision in *Ritchie v. State,* 809 N.E.2d 258, 265, 268 (Ind. 2004), wherein the Indiana Supreme Court explained that "the pivotal inquiry under *Ring* and *Apprendi* is whether exposure to punishment is increased, not whether the punishment should or should not be imposed in a given

case," and then held: "Once a statutory aggravator is found by a jury beyond a reasonable doubt, the Sixth Amendment as interpreted in *Ring* and *Apprendi* is satisfied. . . . The outcome of the weighing does not increase eligibility. Rather, it fixes the punishment within the eligible range. It is therefore not required to be found by a jury under a reasonable doubt standard." *Ring* and *Apprendi* in this context do not assign the task of sentencing to a jury, but prescribe the necessity of pertinent findings before a judge may impose a sentence that increases the maximum punishment for first degree murder from life imprisonment to death. *Lambert, supra.* The Indiana Supreme Court's understanding of *Ring* and *Apprendi* in this context does not run afoul of either prong of § 2254(d)(1).

Having confirmed the necessity of a jury's finding of a statutory aggravator, that finding was made in this case and is separately supported by McManus' concessions that for each of the three murders there was the aggravating circumstance that McManus had committed another murder, and for the murders of both children, there was an aggravating circumstance that the victim was under twelve years old.

In *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), the Supreme Court stated that "it is constitutionally impermissible for a death sentence to rest on a determination made by a sentence who has been led to believe that the responsibility for determining the appropriateness of the defendant's death lies elsewhere." A *Caldwell* violation occurs where the jury is affirmatively misled regarding its role in the sentencing process so as to diminish its sense of responsibility. *Romano v. Oklahoma*, 512 U.S. 1, 8-9 (1994).

McManus' *Caldwell* claim is that the jury was instructed that its recommendation was not binding on the trial court's sentencing decision. A petitioner can only establish a Caldwell

violation if he shows that "the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407 (1989); *see also Fleenor v. Anderson,* 171 F.3d 1096, 1099 (7th Cir. 1999).

On direct appeal, the Indiana Supreme Court addressed this issue by reviewing how the jurors were instructed:

> 'a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law' to establish a *Caldwell* violation. *Romano,* 512 U.S. at 9, 114 S. Ct. 2004. In addition, we note that the jury in this case not only received a correct instruction but, as in *Romano,* was impressed with the importance of its role and the gravity of its decision. The court instructed the jury that: its recommendation is a an integral part of the death penalty process and the law requires that the trial judge give it great weight and serious consideration; the jurors 'should assume that if you recommend the death penalty for Paul M. McManus, he will, in fact, be executed by the State of Indiana per your decision'; it should not rely on leniency or clemency by another authority; and if it is their unanimous decision to recommend death, 'each of you must do so with the fixed assumption in your own mind that the sentence of death will be carried out.' Tr. at 1746-47.

*McManus I*, 814 N.E.2d at 258 (footnote omitted). These comments to the jury did not diminish the jurors' role in sentencing McManus to death because, as set forth above, the jurors were specifically instructed that they should assume if they recommended the death penalty that McManus would be executed and that if they unanimously recommend a death sentence, that "each [juror] must do so with the fixed assumption in your own mind that the sentence of death will be carried out." The jurors were not instructed in such a way that misled them and made them feel less responsible as to their role in sentencing McManus to death. The Indiana Supreme Court's determination was not contrary to, nor was it an unreasonable application of, established federal law as determined by the Supreme Court.

As to each of McManus' sentencing contentions, therefore, the Indiana Supreme Court "took the constitutional standard seriously and produced an answer within the range of defensible positions." *Mendiola v. Schomig,* 224 F.3d 589, 591 (7th Cir. 2000). That decision therefore cannot be set aside in this habeas proceeding.

## V. <u>CONCLUSION</u>

McManus' conviction withstood challenge in the Indiana courts, and thus a presumption of constitutional regularity attaches to it. *See Farmer v. Litscher,* 303 F.3d 840, 845 (7th Cir. 2002) (citing *Parke v. Raley,* 506 U.S. 20, 29-30 (1992)); *Milone v. Camp,* 22 F.3d 693, 698-99 (7th Cir. 1994) ("Federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law").[3]

This Court has carefully reviewed the state record in light of McManus' claims and has given such consideration to those claims as the limited scope of its review in a habeas corpus proceeding permits. "A defendant whose position depends on anything other than a straightforward application of established rules cannot obtain a writ of habeas corpus." *Liegakos v. Cooke,* 106 F.3d 1381, 1388 (7th Cir. 1997). No such established rules entitle McManus to relief in this case. McManus' petition for a writ of habeas corpus is therefore **denied.** Judgment consistent with this Entry shall now issue.

---

[3] Obviously, this is not a presumption related to the AEDPA, but is "the 'presumption of regularity' that attaches to final judgments, even when the question is waiver of constitutional rights." *Parke v. Raley,* 506 U.S. at 29 (citing *Johnson v. Zerbst,* 304 U.S. 458, 464, 468 (1938)).

**IT IS SO ORDERED.**

Date:     03/31/2011

_(signature)_

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

Stephen Creason
stephen.creason@atg.in.gov

Kelly Miklos
kelly.miklos@atg.in.gov

Joseph M. Cleary
jcleary498@aol.com

Marie F. Donnelly
mfdonnelly@aol.com